| | |
|---|---|
| Izaak D. Schwaiger, SBN 267888<br>**SCHWAIGER LAW FIRM**<br>130 Petaluma Avenue, Suite 1A<br>Sebastopol, CA 95472<br>Telephone: (707) 595-4414<br>Facsimile: (707) 581-1983<br>E-mail: izaak@izaakschwaiger.com | Bruce D. Praet, SBN 119430<br>**FERGUSON, PRAET & SHERMAN**<br>1631 East 18th Street<br>Santa Ana, CA  92705-7101<br>Telephone: (714) 953-5300<br>Facsimile: (714) 953-1143<br>E-mail: bpraet@aol.com |
| John H. Scott, SBN 72578<br>**SCOTT LAW FIRM**<br>1388 Sutter Street, Suite 715<br>San Francisco, California 94109<br>Telephone: (415) 561-9601<br>Facsimile:  (415) 561-9609<br>E-mail: john@scottlawfirm.net | Attorneys for Defendants COUNTY OF SONOMA and MICHAEL DIETRICK |

Attorneys for the Plaintiffs ESTATE OF DAVID PELÁEZ CHAVEZ, by and through successor in interest, ROSA LOPEZ CRUZ, and ROSA LOPEZ CRUZ, ESTELLA CHAVEZ CRUZ, D.D.P.L., and S.S.P.L. individually.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF DAVID PELÁEZ CHAVEZ, by and through successor in interest, ROSA LOPEZ CRUZ, and ROSA LOPEZ CRUZ, ESTELLA CHAVEZ CRUZ, D.D.P.L., S.S.P.L., individually,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SONOMA, MICHAEL DIETRICK and DOES 1-25, inclusive.<br><br>Defendants. | Case No. 4:22-cv-06715-DMR<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:        February 15, 2023<br>Time:       1:30 p.m.<br>Courtroom:  via Zoom Video Conference<br>Judge:      The Honorable Magistrate Donna M. Ryu |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

Plaintiffs ESTATE OF DAVID PELAEZ CHAVEZ, by and through successor in interest, ROSA LOPEZ CURZ, and ROSA LOPEZ CRUZ, ESTELLA CHAVEZ CURZ, D.D.P.L., S.S.P.L. INDIVIDUALLY and Defendants COUNTY OF SONOMA and MICHAEL DIETRICK jointly submit this Joint Case Management Statement for the Case Management Conference currently scheduled for February 15, 2023, pursuant to the Northern District of California's Standing Order concerning the "Contents of Joint Case Management Statement," Civil Local Rule 16-9, and Federal Rule of Civil Procedure 26(f).

**1.      JURISDICTION AND SERVICE**

This action arises under Title 42 of the United States Code §1983.  Jurisdiction is conferred pursuant to Title 28 of the United States Code §§1331 and 1343.  Venue is proper pursuant to Title 28, United States Code section 1391(b)(2), as the actions giving rise to the complaint occurred within the County of Sonoma, California.  Jurisdiction and venue are not in dispute.  The Complaint was filed on October 31, 2022.

**2.      FACTS**

**Plaintiff's Statement of Facts:**

David Peláez Chavez was thirty-six years old when he was killed by Sonoma County Deputy Sheriff Michael Dietrick. David was a migrant worker from Mexico who left home to find a better future for his family. He worked in the vineyards of California's wine country and as a skilled tradesman, scraping together a living and sending his paychecks back to his family in Mexico. David was a beloved husband, loving father, and cherished son.

On the morning of July 29, 2022, Sonoma County Sheriff's deputies were dispatched to a rural area near Geyserville after receiving a report that an unidentified barefoot man had thrown a rock through a house window. After being confronted by area residents, the man fled in a truck that belonged to one of the resident's gardeners. The barefoot man was David Peláez Chavez.

Deputy Dietrick arrived on scene and questioned the property owner who advised that David had taken the truck and driven off erratically. He advised Dietrick that there was no way out of the area into which the man had fled.

Dietrick followed after David in his patrol vehicle, and in a few moments came across a neighbor who advised that David had driven through his gates and was at a nearby home. Dispatch advised Dietrick that another reporting party had called to say that David had fled down a hill, and that he was at a nearby home. By the time the deputy arrived at the home, David had already left. The neighbor offered Dietrick a ride in his side-by-side off road vehicle. As the two drove in the direction David had fled, the neighbor explained to Dietrick that he had tried to get David to sit down, but that David looked worried and said that somebody was trying to kill him.

The two shortly encounter Deputy Anthony Powers who joined them in the side-by-side. The search continued over rugged terrain and through the adjoining vineyards for several minutes. Powers commented to Dietrick, "This guy really seems like he's on one." Dietrick replied, "Fuck yeah, dude," and then commented, "He has travelled some fucking distance. Barefoot."

The deputies arrived at another residence and contacted the occupant, who said that someone had stolen one of his ATVs and left a gate open. Dietrick radioed to dispatch his location, and that the gate to the property was open allowing other deputies to respond. The deputies quickly located fresh tracks from the ATV and followed them on the side-by-side further into the hills, but after a few minutes they lost site of the trail. The deputies were advised that backup had arrived at the residence they had just left.

"I wonder if he came up here, realized this went to nothing, and then went back down," said Powers. Their civilian driver replied, "You're going into your inner meth head." All three laughed and followed the tracks back down the hill where they found another open gate and picked up a new set of tracks through rough terrain. "This guy's gotta be crazy," said the driver.

A few moments later, the deputies found the stolen ATV abandoned with its engine running. David was not there. The deputies dismounted and proceeded on foot along a livestock trail, and then toward the crest of the hill.

Powers proceeded to the top of the hill for a better view, and Dietrick split off to lower terrain. The area was wide open rural rangeland with unobstructed views for hundreds of yards.

Rock outcroppings and trees dotted the horizon. There were no houses, structures or people anywhere.

After a few minutes, Powers found footprints in the dirt, then spotted David ahead. He radioed to Dietrick, "I have eyes on. He's at the top of the hill. His back's towards me. He's taking a break right now. I'm sneaking up on him." Dietrick responded, "Copy, I'm trying to make it to you," as he huffed up the hillside. "Fuck me. Shit." Dietrick wheezed, as he stopped to catch his breath. Dietrick took a few more steps, then stopped again winded, then started again, then stopped, bent-over and struggling to breathe.

Ahead, Powers crouched down and radioed his location to dispatch. He reported that David was holding a hammer in one hand, and "maybe a hatchet" in the other. Powers said David was "super tired. He keeps bending over."

"I'm right behind you, Powers," Dietrich breathed heavily into his radio. "You want me to come up further?" "Yeah," responded Powers. "He's kind of facing to the south right now, leaning up against a rock. Do you see me laying down?" "I can see you, just not him," Dietrick responded. "He's directly in front of me," said Powers. "I'd say about fifty yards."

David moaned loudly as Dietrick closed the distance to Powers. Over the radio, Powers guided backup deputies toward their position. David began yelling in Spanish.

"Alright, he sees us," said Powers, and rose to his feet. "Mi amigo!" yelled Dietrick. "No problemas! Come on!" "Abajo!" yelled Powers, ordering David to come down in broken Spanish. "Abajo!"

"Por favor!" screamed David in fear.

"Agua?" the deputies yelled out.

"Ustedes me van matar!" David called out, and turned to run, disappearing over the crest of the hill. If the deputies understood Spanish, they would have known David was saying, "You guys are going to kill me." But his words had no meaning to them.

The deputies gave chase, following after David down the other side of the hill and into a steep and overgrown creek bed. About this time, the Sheriff's helicopter, Henry-1, arrived and

began circling overhead. With backup following behind them, the terrain boxing David in, and with support from the air, David could not escape.

After approximately ten minutes Powers caught up to David. Powers attempted to speak to David in broken Spanish. "Senor! Fuckin', no mas! Aqui, por favor! No problemo!"

David was standing in the shallow creek with a hammer and small garden tiller in one hand, waiving his hands over his head at the helicopter circling above, and screaming for help. "Senor! Put the fucking shit down! No mas!" Powers called out as David turned and began walking further down the creek. Powers tried to re-engage David in dialogue, attempting to talk about his family. David responded, "Si. Ya les llame. Esque no erea mi nombre. Marque le otra ves, para confirmar que no me contestan." (Yes, I called them. It's because it's not my name. (I need to) dial again to confirm that they don't answer.) Though Powers could not understand David, it was clear that he was in an altered mental state.

Powers followed after David down the creek, still attempting to engage him in conversation without success. David crossed out of the shallow water and onto dry ground. He began waving his arms again at the helicopter. As Powers approached, he drew his taser and pointed it at David. David bent over and picked up a rock from the stony bank. Powers quickly backed away, creating distance between himself and David. "No mas! No mas!" Powers called out, but David turned and walked away.

Meanwhile, Deputy Dietrick had worked his way behind David. As David walked away from Powers, Dietrick intercepted him. "Drop it!" Dietrick yelled, pointing his service handgun at David. "Drop it now!"

David raised his hands toward the helicopter and yelled at the sky. "Put it down!" commanded Dietrick. David waved at the helicopter and kept yelling. "Put it down!" yelled Dietrick. "Ustedes me quieren matar!" (You guys want to kill me!) Exhausted, David dropped the stone and bent over with his hands on his knees, trying to catch his breath.

Deputy Powers scrambled out of the creek bed to David's position in time to see Deputy Dietrick pointing his handgun at David from uphill, about twenty feet away. "Hey!" called out

Powers as he approached with his Taser drawn, but his gun holstered. David turned to Powers, then stooped over again. "Put it down!" yelled Dietrick. Before he had completed his own words, Sonoma County Sheriff's Deputy Michael Dietrick fired three rounds into David's body. One round entered David's chest, another into his arm, and the third into his brain. Near simultaneously, Powers fired his Taser at David, a non-lethal and appropriate response to the situation. But Powers' good tactics and discretion was for nothing, as David lay bleeding to death on the rocks. He died at the bottom of that ravine, alone and afraid.

David's death was unnecessary. While his behavior was strange and erratic, he posed no more than a hypothetical threat to anyone. Despite his bizarre behavior, at no time did he try to hurt a soul. He was plainly in an altered mental state – whether because of drugs or because of a mental health crisis is unknown at this time. He was barefoot, exhausted, and had nowhere to go. Time and distance were on the deputies' side. Deadly force simply was not an option.

**Defendant's Statement:**

Without repeating a lengthy rendition of the underlying facts, it is not surprising that Defendants have a somewhat different perspective on this incident. Although the independent investigation conducted by the Santa Rosa Police Department has been submitted to the District Attorney for review and is not yet available to the parties, Defendants contend that the final use of deadly force was tragic, but nonetheless reasonable under the totality of the circumstances.

Sonoma County deputies were responding to reports of an individual who had terrorized two families by throwing large rocks into occupied homes, stealing a pickup truck as well as a side by side vehicle. In fact, the only reason decedent fled one residence was because the homeowner fired warning shots from his handgun. Recognizing the rural nature of the area, deputies knew that it would be critical to locate and apprehend decedent before he was able to terrorize another family among the isolated homes.

Following extensive and impressive tracking by deputies, decedent was finally located in a remote creekbed, holding a hammer in one hand and a garden trowel in the other. Despite efforts by deputies to calmly persuade decedent to drop his weapons, including offers of water

and de-escalation techniques, decedent refused to comply. Consistent with training, Deputy Powers held his Taser while Deputy Dietrick provided lethal cover. In addition to the tools held by decedent, he had gathered large rocks. After dropping one rock, decedent picked up another large rock which he prepared to throw at Deputy Dietrick. Simultaneously recognizing the imminent threat, both deputies fired their respective weapons.

Both deputies then immediately commenced CPR for over fifteen minutes while awaiting the arrival of a helicopter with a medic to the remote location. Despite the heroic efforts of deputies, decedent succumbed to his injuries.

**3.    LEGAL ISSUES**

Whether the force used by Defendant Dietrick was reasonable under the circumstances;

If the force used by Defendant Dietrick was unreasonable, whether he is nonetheless entitled to qualified immunity;

Whether Defendant Dietrick breached a duty of reasonable care to David, or whether Defendant Dietrick's acts and omissions violated any provision of the California Penal Code;

If there was an underlying constitutional violation, whether the customs and practices of the Sonoma County Sheriff were a moving force in causing David's death;

**4.    MOTIONS**

There are no motions pending.

Plaintiffs anticipate filing a motion to appoint a guardian ad litem for David's son, D.D.P.L (please see *Amendment of Pleadings* for more information.)

Defendants anticipate bringing a summary judgment motion minimally addressing qualified immunity and *Monell* issues upon completion of sufficient discovery.

**5.    AMENDMENT OF PLEADINGS**

Plaintiff foresees amending the pleadings within the next four weeks to correctly identify the roles of all parties. Since the filing of the Complaint, Plaintiffs' counsel has become aware of an error in the identification of the parties, specifically that David's son, D.D.P.L., is not the son of Rosa Lopez Cruz, but of a different mother. Accordingly, Plaintiffs' counsel must correct the

pleadings in that regard, and must seek leave of the Court to appoint D.D.P.L.'s biological mother as his guardian ad litem.

**6.      EVIDENCE PRESERVATION**

The parties will comply with all applicable preservation requirements under federal law.

**7.      DISCLOSURES**

The parties have agreed to exchange initial disclosures no later than January 25, 2023. Given the pending criminal investigation and attendant delay in the release of critical documents by the investigating agency, the parties anticipate initial disclosures will be somewhat limited.

**8.      DISCOVERY**

At this time, the parties agree to the limits on discovery, generally, and depositions, specifically, set forth in the Federal Rules of Civil Procedure. The parties reserve their right to propose further limitations or modifications of the discovery rules.

The parties will conduct written discovery and are evaluating the necessary depositions. Subpoenas for medical and/or other records will be necessary as well.

Because Plaintiffs are citizens of Mexico and their depositions reasonably necessary, the parties anticipate it will be necessary for Plaintiffs and their representatives to procure humanitarian parole to travel to the United States to be deposed. U.S. Citizen and Immigration Services reports that eighty percent of current applications for humanitarian parole are adjudicated within 14.3 months due to a backlog of applicants. Should this process delay discovery and no other reasonable remedy avail itself, the parties may seek modification of the pre-trial schedule.

**9.      CLASS ACTIONS**

This is not a class action.

**10.     RELATED CASES**

The parties are not aware of any related cases.

**11.   RELIEF**

Plaintiff seeks an award of compensatory, economic, general, and punitive damages according to proof, an award of attorneys' fees and costs, and such other relief as the Court may deem necessary and appropriate.

**12.   SETTLEMENT AND ADR**

Pursuant to Civil L.R. 16-8 and ADR L.R. 3-5, the parties anticipate requesting a Settlement Conference with a Magistrate Judge, though given the anticipated delays in discovery, the parties request the timing of that referral be deferred until January, 2024.

**13.   OTHER REFERENCES**

The parties do not consent to binding arbitration or mediation. They further do not believe that reference to a special master or the Judicial Panel on Multidistrict Litigation is necessary or appropriate.

**14.   NARROWING OF ISSUES**

The issues may be narrowed or disposed of by motions for summary judgment or partial summary judgment. The parties currently have no suggestions for expediting presentation of evidence at trial, but will reconsider that possibility after the case becomes more defined as it approaches trial.

**15.   EXPEDITED TRIAL PROCEDURE**

The parties do not believe an expedited schedule is appropriate.

**16.   SCHEDULING**

Given the anticipated delays in discovery, the parties propose the following schedule:

| | |
|---|---|
| Fact Discovery Cutoff: | April 8, 2024 |
| Expert Disclosures: | May 5, 2024 |
| Expert Discovery Cutoff: | June 10, 2024 |
| Last Day to Hear Dispositive Motion: | August 8, 2024 |
| Final Pre-Trial Conference: | September 9, 2024 |
| Trial: | October 15, 2024 |

**17. TRIAL**

The parties request this matter to be tried by jury and anticipate it will take approximately seven to ten days.

**18. DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

Civil L.R. 3-16 does not apply to governmental entities.

Plaintiff has not filed Certifications of Interested Entities or Persons under Civil Local Rule 316. Plaintiff hereby restates that as of this date, other than the named parties, there is no such interest to report.

**19. PROFESSIONAL CONDUCT**

All attorneys of record have reviewed the Guidelines for Professional Conduct for the Northern District of California.

**20. OTHER MATTERS**

The parties are unaware of any other matters at this time that may facilitate the just, speedy and inexpensive disposition of this matter.

Dated:  January 23, 2023          **SCHWAIGER LAW FIRM**

By: */s/ Izaak D. Schwaiger*
    Izaak D. Schwaiger
    Attorneys for Plaintiffs

Dated: January 23, 2023          **SCOTT LAW FIRM**

By: */s/ John Houston Scott*
    John Houston Scott
    Attorneys for Plaintiffs

Dated:  January 23, 2023          **FERGUSON, PRAET & SHERMAN**

By: */s/ Bruce D. Praet*
    Bruce D. Praet,
    Attorneys for Defendants

## **ELECTRONIC CASE FILING ATTESTATION**

I, Izaak D. Schwaiger hereby attest that I have on file all holograph signatures for any signatures indicted by a conformed signature ("/s/") within this E-filed document or have been authorized by counsel to show their signature on this document as /s/.

Dated: January 23, 2023                  SCHWAIGER LAW FIRM

                                             /s/ *Izaak D. Schwaiger*
                                             Izaak D. Schwaiger