1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   ESTATE OF DAVID PELAEZ CHAVEZ,          Case No.  22-cv-06715-DMR
    et al.,
8
            Plaintiffs,                      **ORDER ON DEFENDANT'S MOTION
9                                            FOR SUMMARY JUDGMENT**
        v.
10                                           Re: Dkt. No. 62
    COUNTY OF SONOMA, et al.,
11
            Defendants.
12

13          This case arises from the shooting death of David Pelaez-Chavez by Sonoma County

14   deputy sheriff Michael Dietrick on July 29, 2022.  Plaintiffs are the Estate of David Pelaez-Chavez

15   ("the Estate"); D.D.P.L. and S.S.P.L, the decedent's minor children appearing through their

16   guardians ad litem individually and as successors in interest to the Estate; and Estella Chavez

17   Cruz, the decedent's mother.  Plaintiffs bring a civil rights action asserting constitutional

18   violations pursuant to 42 U.S.C. § 1983 as well as related state law claims against Defendants

19   Sonoma County and Dietrick.  Defendants now move for summary judgment.  [Docket No. 62

20   ("Mot.").]  The court held a hearing on September 26, 2024.  For the following reasons, the

21   motion is denied.

22   **I.      BACKGROUND**

23          **A.      Statement of Facts**

24          The following facts are undisputed unless otherwise noted.  The events at issue were

25   partially captured on the body-worn cameras ("BWCs") of Dietrick and fellow Sonoma County

26   deputy sheriff Anthony Powers.  On July 29, 2022, at approximately 8:15 a.m., Dietrick responded

27
28

United States District Court
Northern District of California

to a call about an abandoned vehicle.  [Docket Nos. 62-1 (Bruce Praet Decl., July 23, 2023[1]) ¶ 2; 62-2 (Sonoma County District Attorney's Officer-Involved Fatal Incident Report, "DA Report") at 6.]  The vehicle was parked at a winery away from the main road, and there were no indications that a crime had been committed or that the vehicle had been stolen.  [Docket No. 75 (Michael Dietrick Dep., Oct. 24, 2023) at 76, 79-80.]  Dietrick completed his investigation.  As he was leaving, he received a priority 2 (urgent) call from the sheriff's dispatch at 8:22 a.m.  Dietrick Dep. 80-81; Schwaiger Decl. ¶ 2, Ex. A (Computer Aided Dispatch log, "CAD Log") at D-00010. Dispatch informed Dietrick that there had been an incident at a house on Tre Monte Lane where someone had thrown a rock through a window.  [Docket No. 68-1 (Izaak Schwaiger Decl., Aug. 13, 2024) ¶ 4; Ex. C (partial audio transcript of communications over sheriff's radio channel, "Radio Transcript").]

Dietrick arrived at the address on Tre Monte Lane at approximately 8:37 a.m.  [Docket No. 77 (Dietrick BWC) (internal time stamp at 0:00:00).]  The resident met Dietrick at the gate of the property and told him that a Hispanic male had broken a window in his house, that the suspect was barefoot, and that the resident had confronted the suspect with his firearm and had fired several warning shots at the suspect's feet.  Schwaiger Decl. ¶ 5, Ex. D (transcript of Dietrick BWC audio from 0:00:30 to 0:03:10); Dietrick Dep. 83.  The suspect was holding rocks and had yelled at the resident, but there were no reports that the suspect injured or threatened to injure the resident. Dietrick Dep. 86.  The suspect then stole the gardener's truck and drove away, breaking multiple gates.  *Id.* at 85, 88.  The parties dispute what Dietrick knew about how Pelaez-Chavez stole the gardener's truck.  Dietrick testified that the resident said "something about there was some kind of altercation" where the gardener had been "dragged," and so he assumed this was a carjacking.  *Id.* at 85.  Plaintiffs, on the other hand, point to Dietrick's BWC audio in which the resident does not mention any violence against the gardener to Dietrick.  The resident stated that the gardener had left his keys in the truck, suggesting that Pelaez-Chavez had simply gotten in and driven off. Schwaiger Decl. ¶ 5, Ex. D.  In Dietrick's interview with the Santa Rosa Police Detectives

---

[1] The court assumes this is a typographical error and should read "2024."

("SRPD") two days after the shooting, Dietrick stated that Pelaez-Chavez "jumped into the gardener's truck" to steal it and did not mention any violence to the gardener. Schwaiger Decl. ¶ 6, Ex. E (Transcript of SRPD recorded interview, July 31, 2022, "SRPD Interview") at 300-327.

At 8:48 a.m., Dietrick received a report of another incident at a second residence on Tre Monte Lane, approximately 2100 feet away from the first location. CAD Log D-000011; DA Report 8. Dispatch reported that the suspect was "on his knees asking for something in Spanish." CAD Log D-000011. The suspect then ran away. *Id.* at D-000012. Dispatch advised Dietrick that the suspect was "begging [the reporting party] to kill him, he had 3 large rocks in his hands." *Id.* Dietrick quickly went to the second location. Along the way, he spotted the gardener's truck abandoned in a ditch. Dietrick Dep. 89-90. After Dietrick arrived, the resident of the second location informed him that he had pointed his firearm at the suspect, and that the suspect had fled down a hill. *Id.* at 90. Around 8:56 a.m., Sonoma County deputy sheriff Anthony Powers joined Dietrick as his backup. [Docket No. 77 (Powers BWC) (internal time stamp at 0:00:00).] The resident at the second location gave the deputies a ride in his side-by-side vehicle in the direction Pelaez-Chavez had fled. Dietrick Dep. 92. At a third residence, a ranch hand informed the deputies that a vehicle had been stolen from the property. *Id*. at 93. The resident from the second location and the deputies continued until around 9:25 a.m., when they came across the stolen vehicle that had been abandoned with its engine left running. *Id.* at 95; Dietrick BWC 0:47:30. The deputies got out of the resident's vehicle and began searching for Pelaez-Chavez on foot. Dietrick Dep. 95. Dispatch advised Dietrick that an additional two units from California Highway Patrol ("CHP") were enroute. CAD Log D-000014.

For approximately 30 minutes, the deputies tracked Pelaez-Chavez through the hills. CAD Log D-000014-16; DA Report 19. The terrain was rugged and steep in a rural and remote area, and it was sometimes difficult to see things at a distance due to changes in elevation and vegetation. DA Report 19. Dietrick testified there was a "possibility" that Pelaez-Chavez would run into other people in the hills but acknowledged he did not see any people or homes, and that there were no nearby dirt roads or trails for the duration the deputies were in contact with Pelaez-Chavez. Dietrick Dep. 130-132. Powers spotted Pelaez-Chavez first. Powers BWC 0:40:40. He

reported over the radio to Dietrick that Pelaez-Chavez was holding "maybe a hatchet and a hammer in each hand." *Id.* at 0:41:55. The two items (which turned out to be a hammer and a garden hoe-and-tiller) were each about a foot long with metal ends. DA Report 24-25. Powers also told Dietrick that Pelaez-Chavez was "super tired" and kept bending over in exhaustion, but did not let go of the tools. *Id.* at 0:42:30. The deputies attempted to stay out of sight, but Pelaez-Chavez saw them and began screaming. Dietrick Dep. 105. The deputies attempted to make verbal contact in English and broken Spanish, such as "no problemas" (no problems), "abajo" (down), and "agua" (water). *Id.*; Dietrick BWC 1:06:38. In response, Pelaez-Chavez yelled in Spanish, "Please! You are going to kill me!" Powers BWC 0:47:50; DeFoe Report 5. Dietrick did not speak Spanish well enough to understand what Pelaez-Chavez was saying and did not know if Pelaez-Chavez understood anything the deputies said. Dietrick Dep. 115; 144.

Pelaez-Chavez then continued to move away from the deputies. Powers BWC 0:48:28. The deputies gave chase, yelling phrases such as, "put it fucking down, put it down," "manos arriba" (put your hands up), and "alto" (stop). *Id.* at 0:51:00; 0:52:05. Powers radioed to Dietrick that Pelaez-Chavez was "holding the weapons aggressively, just hit a tree, and then ran off." *Id.* at 0:51:15. Dietrick was behind Powers and could not see Pelaez-Chavez from his position, but could hear yelling and the thumping of him hitting the tree with the tools. Dietrick Dep. 133.

At 9:49 a.m., Powers said to Dietrick: "You want me to be Taser? You be my lethal cover." Powers BWC 0:52:40. Dietrick agreed. Powers and Dietrick later explained this was a tactical plan where Powers would be prepared with his less-than-lethal Taser, while Dietrick would be prepared with his lethal firearm. Dietrick Dep. 142; DA Report 12. Dietrick would hold the suspect with lethal cover while Powers would try to get into position with the Taser. Dietrick Dep. 142. Once Pelaez-Chavez had dropped a weapon or Powers had an opportunity, Powers would then deploy the Taser and take Pelaez-Chavez into custody. DA Report 12.

Helicopter support arrived overhead to assist the deputies in tracking Pelaez-Chavez. Dietrick Dep. 99, 139. Powers followed Pelaez-Chavez to a shallow creek bed. Powers BWC 1:01:33. Pelaez-Chavez walked along the creek. *Id.* Powers walked some distance behind him, still attempting to communicate with Pelaez-Chavez and trying to get close enough to use his

4

United States District Court
Northern District of California

1   Taser.  *Id.*  The helicopter could be heard loudly overhead.  *Id.*  Dietrick had fallen behind Powers

2   and Pelaez-Chavez.  Dietrick Dep. 137.  He decided to climb out of the creek bed up to a flat,

3   grassy part of the slope to try to catch up.  *Id.*; Dietrick BWC 1:22:09.  The footing on the creek

4   bed and along the slope was unstable with vegetation and loose stones.  At one point, Dietrick

5   slipped and landed on his hands with such force that his sunglasses fell from his head.  Dietrick

6   BWC 1:22:16.  After Dietrick reached the flat part of the slope, he was able to move faster.  While

7   Powers and Pelaez-Chavez walked along the creek, Dietrick ran in a straight line parallel to the

8   creek.  *Id.* at 1:22:23.

9        Pelaez-Chavez began climbing out of the creek and up the slope, holding a rock that

10  appeared to be slightly larger than a softball in his right hand and the two tools in his left hand.  *Id.*

11  at 1:22:32.  Dietrick pointed his gun at Pelaez-Chavez and yelled, "Drop it! Drop it now! Drop it!"

12  as he continued to move to intercept him.  *Id.*  Pelaez-Chavez was not facing Dietrick at first and

13  did not acknowledge Dietrick.  He continued walking through the shrubbery until he emerged in

14  the flat part of the slope, now directly facing Dietrick.  Dietrick Dep. 139-140; Dietrick BWC

15  1:22:43.  Dietrick stopped no more than twenty feet away from Pelaez-Chavez and continued

16  commanding him to "drop it" or "put it down" while pointing the gun at him.  Dietrick BWC

17  1:22:43; DeFoe Report 6.  Pelaez-Chavez stopped with his left foot in front of his right foot,

18  turned away from Dietrick, and raised his arms over his head (with objects still in hand), yelling

19  and waving at the helicopter.  *Id.* at 1:22:44.  He switched the rock from right hand to left hand

20  and waved at the helicopter with his open hand.  He also yelled in Spanish, "You guys want to kill

21  me!"  *Id.* at 1:22:48; DeFoe Report 6.  Dietrick later stated that he was "on the cusp of potentially

22  shooting him" when Pelaez-Chavez initially raised his arms, but that he "held off for a second" to

23  buy time for Powers to arrive with the Taser.  SRPD Interview 593-600.  Dietrick understood that

24  the yelling and waving was directed at the helicopter, not Dietrick.  *Id.* at 600-601.  Dietrick knew

25  Pelaez-Chavez was speaking Spanish but could not understand what he said.  *Id.* at 603.

26       Pelaez-Chavez lowered his arms, switched the rock back to his right hand, and looked at

27  Dietrick again.  Dietrick BWC 1:22:49.  Then he bent over to rest with his hands braced on his

28  knees, body facing to Dietrick's left.  *Id.* at 1:22:50; Powers BWC 1:03:47.  The rock fell from his

1   right hand.  Dietrick BWC 1:22:52.  Dietrick continued commanding Pelaez-Chavez to "put it

2   down."  *Id.*  After a few seconds, Pelaez-Chavez straightened and looked around, arms at his sides.

3   Powers BWC 1:03:51.

4        At this point, Powers had also climbed out of the creek, and was quickly moving through

5   the trees and shrubbery toward Pelaez-Chavez and Dietrick.  Powers BWC 1:03:45-51.  He said,

6   "Hey."  *Id.* at 1:03:51.  Dietrick later stated that he was aware Powers was approaching and knew

7   that he was to Dietrick's left.  SRPD Interview 605-606.  Dietrick took two steps toward Pelaez-

8   Chavez.  Powers BWC 1:03:52.  As Dietrick approached, Pelaez-Chavez bent down again, and

9   reached to pick up a rock with his right arm straight down.  *Id.* at 1:03:53; Dietrick BWC 1:22:58.

10  Dietrick saw "in [his] mind" that Pelaez-Chavez was going to throw the rock at him.  Dietrick

11  Dep. 156.  Dietrick shouted one last time, "Put it down," and immediately after, fired three shots

12  in quick succession before Pelaez-Chavez could rise.  Dietrick BWC 1:22:59.  Powers also shot

13  his Taser.  Powers BWC 1:03:54.  Pelaez-Chavez collapsed to the ground.  *Id.*; Dietrick BWC

14  1:22:59.

15        The deputies administered CPR for about 20 minutes until paramedics arrived.  DA Report

16  24.  Pelaez-Chavez died of gunshot wounds to the head and torso.  *Id.* at 26-27.  The autopsy

17  report stated that the direction of travel of the bullets was "left to right and slightly front to back,"

18  indicating that Pelaez-Chavez's head and torso were not directly facing Dietrick when he was

19  shot.  Praet Decl. ¶ 5; [Docket No. 62-5 (Autopsy Report) at SRPD-00360].  The autopsy report

20  also found acute methamphetamine intoxication.  Autopsy Report at SRPD-00346.  Dietrick

21  testified that he believed Pelaez-Chavez intended to kill him or cause him great bodily injury,

22  because Pelaez-Chavez was re-arming himself with a rock and "getting ready to throw it" at him.

23  Dietrick Dep. 203.  Dietrick stated that he believed it was "possible" Pelaez-Chavez could also

24  throw the rock at Powers, but this was only a potential threat, because he believed Pelaez-Chavez

25  was about to throw the rock at Dietrick.  *Id.* at 201-202.  Dietrick testified, "There was no doubt in

26  my mind that when [Pelaez-Chavez] had dropped that rock, picked it back up, that he was going to

27  throw that rock at me."  *Id.* at 204.  When asked if Pelaez-Chavez made a gesture as if to throw the

28  rock, Dietrick stated, "In hindsight after looking at the video slowed down, it appears that way."

United States District Court
Northern District of California

*Id.* at 156.  Powers testified that Pelaez-Chavez made a "windup, kind of telegraphing" that he was getting ready to throw the rock, but also stated that "it's hard . . . even watching the video, it's hard for me to determine" what gesture Pelaez-Chavez had made.  Powers Dep. 136-137.

### B.    Procedural History

Plaintiffs filed the operative complaint on February 28, 2023 alleging the following claims for relief: 1) 42 U.S.C. § 1983 ("Section 1983") claim for excessive force against Dietrick, based on the Fourth Amendment; 2) Section 1983 claim for deprivation of familial association against Dietrick, based on the Fourteenth Amendment; 3) Section 1983 claim for municipal liability (the "*Monell* claim") based on custom and policy against Sonoma County; and 4) negligence against both Defendants.  [Docket No. 22 (First Amended Complaint ("FAC")).]

Plaintiffs agreed to voluntarily dismiss their *Monell* claim.  Mot. Cover Sheet.

## II.    LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The court must view the evidence in the light most favorable to the non-moving party.  *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party.  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248).  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of

United States District Court
Northern District of California

United States District Court
Northern District of California

1    material fact exists. *Devereaux*, 263 F.3d at 1076. More than a "scintilla of evidence" must exist

2    to support the non-moving party's claims. *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477

3    U.S. at 252). A showing that "there is some 'metaphysical doubt' as to the material facts as issue"

4    will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting

5    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Where the

6    record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

7    is no genuine issue for trial." *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at

8    587).

9    **III.    EVIDENTIARY OBJECTIONS AND REQUEST FOR JUDICIAL NOTICE**

10          Plaintiffs object to Defendants' Exhibits 1 (DA Report), 4 [Docket No. 62-5 (Coroner's

11   Autopsy Report), and 11 [Docket No. 62-13 (Estella Chavez Cruz Dep., May 27, 2024)].

12   Plaintiffs argue these exhibits are irrelevant to the extent they are being offered to provide

13   information that was not known to Dietrick at the time of the shooting. Under both federal and

14   California law, the reasonableness inquiry in excessive force cases is "judged from the perspective

15   of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v.

16   Connor*, 490 U.S. 386, 396 (1989); *Hayes v. County of San Diego*, 57 Cal. 4th 622, 632 (2013).

17   The court sustains Plaintiffs' objections to the extent Defendants argue the shooting was

18   reasonable because of later-learned information contained in these exhibits.

19          Plaintiffs request that the court take judicial notice that Dietrick is "clinically obese" based

20   on his height and weight, citing the National Institute of Health and the Centers for Disease

21   Control and Prevention body mass index ("BMI") calculators. [Docket No. 68 (Opp'n) at 8 fn. 1.]

22   Defendants object. [Docket No. 72 (Reply) at 4 fn. 1.] Plaintiffs' request is denied. They appear

23   to offer Dietrick's BMI as a medical diagnosis to support an inference that he was physically unfit.

24   The court may only judicially notice a fact if it is not subject to reasonable dispute. Fed. R. Civ. P.

25   201. A medical diagnosis of clinical obesity based solely on BMI is open to reasonable dispute.[2]

26   ─────────────────────────

27   [2] As recognized by the Mayo Clinic, BMI "doesn't directly measure body fat. Some people, such
     as muscular athletes, may have a BMI in the obesity category even though they don't have excess

28   body fat." *See* https://www.mayoclinic.org/diseases-conditions/obesity/symptoms-causes/syc-
     20375742.

1    Defendants object to Plaintiffs' frame-by-frame analysis of the BWC footage (Schwaiger

2  Decl. ¶¶ 7, 9, Exs. F, H), citing several out-of-circuit decisions holding it is not appropriate to rely

3  on frozen frames to judge the reasonableness of a particular use of force.  Reply 4; *see*

4  *Cunningham v. Shelby Cnty.*, 994 F3d 761, 766 (10th Cir. 2021) *cert denied* 142 S.Ct. 711 (2021);

5  *Tucker v. Shreveport*, 998 F3d 165, 176 (5th Cir. 2021); *Lopez v. Sheriff of Cook Cnty.*, 993 F3d

6  981, 992 (7th Cir. 2021).  The Ninth Circuit has held that "the probative value of real-time videos

7  and frozen frames is more appropriately a matter for a jury to view and evaluate, not a matter for a

8  court to resolve on summary judgment."  *Longoria v. Pinal Cnty.,* 873 F.3d 699, 706 n.5 (9th Cir.

9  2017).  It is possible for frozen frames to demonstrate the existence of a genuine dispute of

10  material fact.  *Id.* at 706.  In any event, Defendants' objection is denied as moot because the court

11  does not rely on Plaintiffs' frame-by-frame analysis to decide the motion.

12    Defendants make a non-specific objection to Plaintiffs' expert report, describing it as a

13  20/20 hindsight analysis.  Reply 7.  The court overrules the objection.  Defendants do not object to

14  the underlying facts relied upon by DeFoe.  Defendants make disparaging remarks about DeFoe

15  being an "unqualified" or "self-proclaimed" expert, but do not identify any issues with DeFoe's

16  extensive credentials as a former Los Angeles Police Department officer and sergeant for 28 years.

17  Reply 7, 11; DeFoe Report 27-33.

18  **IV.    DISCUSSION**

19    The court addresses Plaintiffs' section 1983 claims against Dietrick under the Fourth and

20  Fourteenth Amendments before turning to the negligence claim against both Defendants.

21    **C.    Excessive Force**

22       **1.    Legal Standard**

23    A claim of excessive force in the context of an arrest or investigatory stop implicates the

24  Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see*

25  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Courts analyze claims of excessive force under an

26  "objective reasonableness" standard.  *Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010)

27  (citing *Graham*, 490 U.S. at 395).  The reasonableness inquiry in excessive force cases is an

28  objective one: whether the officer's actions are objectively reasonable in light of the facts and

United States District Court
Northern District of California

circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citations and internal quotation marks omitted).

Because the reasonableness standard from *Graham* is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). These factors "are not exclusive. Rather, [the court] examine[s] the totality of the circumstances and consider[s] 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826 (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Courts also consider the "'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

The Ninth Circuit has cautioned that in excessive force cases resulting in a death, courts must be "wary of self-serving accounts by police officers when the only non-police eyewitness is dead." *Long v. City and Cty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Accordingly, a court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Henrich*, 39 F.3d at 915 (citations omitted). Where a video of the incident exists, the court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381

(2007).  However, "the mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury."  *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).  "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted).  However, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."  *Henrich*, 39 F.3d at 915.

### 2. Analysis

Defendants argue that summary judgment is appropriate on Plaintiffs' excessive force claim because Dietrick's use of force was objectively reasonable, and also because Dietrick is entitled to qualified immunity.

To assess the objective reasonableness of Dietrick's use of deadly force, the court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (citation and quotation omitted).

#### a. Nature and Quality of Intrusion

Dietrick shot Pelaez-Chavez three times and killed him, resulting in the highest level of intrusion on his Fourth Amendment interests.  *See Tennessee v. Garner,* 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched.").

#### b. Governmental Interests at Stake

To determine the governmental interests, the court must examine the non-exhaustive factors set forth in *Graham*.  These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

1    resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396.

### i.   Severity of the Crime

The first *Graham* factor examines the severity of the crime.  There is a factual dispute regarding the severity of the crimes committed by Pelaez-Chavez.  Defendants characterize Pelaez-Chavez's throwing a rock through the window at the first Tre Monte Lane location as an attempted break-in, and his theft of the gardener's car as a violent carjacking.  Mot. 2-3.  Plaintiffs characterize these actions as non-violent property crimes which may be misdemeanors.  Opp'n 2-4.  There are facts in the record which support Plaintiffs' characterization of the events.  No attempted break-in or violence against the gardener was reported to dispatch.  CAD Log.  Dietrick did not recount any violence, assault, or threats by Pelaez-Chavez against people during his interview with SRPD two days after the shooting.  SRPD Interview 310-330.  The Sonoma County DA described Pelaez-Chavez's crimes as "vandalism and theft."  DA Report 31.  The cars stolen by Pelaez-Chavez were quickly recovered by the deputies, as Pelaez-Chavez abandoned them before fleeing into the hills.

"[A] particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor."  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019).  In addition, courts use "the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied."  *Id.*  If no crime is in progress when police arrive, the severity of the crime is lower.  *Id.*  Drawing all reasonable inferences in favor of Plaintiffs, the severity of the crime is low.  A reasonable jury may conclude that Pelaez-Chavez committed only non-violent misdemeanor property crimes.  In addition, it is undisputed that no crime was in progress when the deputies were pursuing Pelaez-Chavez in the hills.

### ii.   Immediacy of the Threat to Safety

The second *Graham* factor asks whether the suspect posed an immediate threat to the safety of the officers or others.  It is the "most important" factor.  *See Bryan*, 630 F.3d at 826.  While Dietrick avers that he felt threatened before he shot Pelaez-Chavez, such a statement "is not enough; there must be objective factors to justify such a concern."  *George v. Morris*, 736 F.3d

1  829, 838 (9th Cir. 2013) (citation omitted).

2      "The mere fact that a suspect possesses a weapon does not justify deadly force." *Hayes v.*

3  *Cty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013).  Moreover, "[a] desire to resolve quickly

4  a potentially dangerous situation is not the type of governmental interest that, standing alone,

5  justifies the use of force that may cause serious injury." *Deorle v. Rutherford*, 272 F.3d 1272,

6  1281 (9th Cir. 2001).  Instead, the officer must have "probable cause to believe that the suspect

7  poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471

8  U.S. at 3.  Where a fleeing suspect poses no immediate threat to the officer and no threat to others,

9  "the harm resulting from failing to apprehend him does not justify the use of deadly force to do

10  so." *Id.* at 11.  But "[i]f the person is armed—or reasonably suspected of being armed—a furtive

11  movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*,

12  736 F.3d at 838.  An officer is not required to wait until a suspect actually aims a weapon at him

13  before he uses deadly force. *Id.*

14      Defendants argue that Pelaez-Chavez made "a furtive movement" which created an

15  immediate threat.  Reply 9; *see George*, 736 F.3d at 838.  The court finds there are disputed facts

16  which are material to the determination of whether a reasonable officer would have perceived that

17  Pelaez-Chavez posed an immediate threat.  For example, there is a dispute about whether Pelaez-

18  Chavez made a gesture as if he was going to throw the rock at Dietrick.  Both deputies stated that

19  he did, but both also admitted that they needed to review the BWC footage before reaching this

20  conclusion.  Dietrick Dep. 156; Powers Dep. 136-137.  Dietrick couched his perception as "in

21  hindsight after looking at the video slowed down." Dietrick Dep. 156.  Reasonableness is judged

22  based on the officer's perspective in the moment, not with the benefit of hindsight after reviewing

23  slowed-down video footage. *See Graham*, 490 U.S. at 396.  Considering the BWC footage at

24  normal speed, a reasonable juror could conclude that Pelaez-Chavez was bending down to pick up

25  the rock with his arm straight down and had not made any "windup" gesture or other movement

26  indicating he was going to throw the rock at Dietrick when Dietrick shot him.  Powers BWC

27  1:03:53; Dietrick BWC 1:22:58.  Dietrick also stated that he believed Pelaez-Chavez was going to

28  throw the rock because Pelaez-Chavez's "left foot was out farther forward.  He stepped back with

his right [foot], leaned down . . . picked up the rock, and as he was coming up, his arm was coming up and slightly moving back."  Dietrick Dep. 157.  However, a reasonable juror reviewing the BWC footage could find that Pelaez-Chavez's adjustment of his feet and slight raising of his arm were merely the natural motions of someone picking up a rock, and were not a "windup" for throwing the rock.  *See Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1016 (9th Cir. 2017) (finding that the slight rise of a suspect's gun as he turned to face the officers did not create an immediate threat if it was incidental to the suspect's natural, non-aggressive turning motion).

There is also a dispute about whether a reasonable officer would have believed Pelaez-Chavez was picking up the rock because he intended to throw it at Dietrick.  A reasonable juror may find that throughout the time Dietrick was investigating and pursuing Pelaez-Chavez, Dietrick was not aware of Pelaez-Chavez making any threats or acting aggressively toward a person.[3]  Although Pelaez-Chavez had been holding multiple large rocks while interacting with the Tre Monte Lane residents, he never threw the rocks at the residents or threatened to harm them in any way, even when they pointed guns or fired at him.  Dietrick Dep. 86; CAD Log D-000012.  At the time of the shooting, all Dietrick knew was that Pelaez-Chavez had thrown a rock through a window an hour and a half earlier, and had hit a tree with his tools about 12 minutes prior.[4]  Dietrick saw Pelaez-Chavez yell and raise his arms at the helicopter immediately before the shooting, but a juror may determine that this was not a threatening gesture—Pelaez-Chavez waved at the helicopter with his open palm, and Dietrick admitted that Pelaez-Chavez's attention was on the helicopter, not on him.  Dietrick BWC 1:22:44; SRPD Interview 600-601.  There is also evidence that Pelaez-Chavez was not facing Dietrick when he was shot.  Autopsy Report at SRPD-00360.  Powers testified that he believed Dietrick was justified in shooting Pelaez-Chavez because it appeared he was going to throw the rock at Dietrick.  Powers Dep. 148.  A juror could

---

[3] As discussed earlier, there is a dispute of fact about whether Dietrick heard that Pelaez-Chavez had acted violently toward the gardener at the first Tre Monte Lane location.

[4] Defendants point to evidence that Pelaez-Chavez had killed small animals with rocks in the past, Praet Decl. ¶ 12; [Docket No. 62-13 (Estella Chavez Cruz Dep., May 27, 2024) at 51], and that he had raised a rock over his head at Powers prior to the shooting.  Powers BWC 1:03:14.  There is no evidence that Dietrick knew these facts at the time of the shooting, making them irrelevant to the Fourth Amendment analysis.

United States District Court
Northern District of California

1    discount Powers's credibility because he also testified that Pelaez-Chavez made a "windup"

2    motion before he was shot, and a reasonable juror could decide that this is contradicted by the

3    BWC footage. *Id.* at 136-137. Dietrick testified there was "no doubt in [his] mind" that Pelaez-

4    Chavez was going to throw the rock at him, but he was not able to articulate a reason for this

5    belief other than the fact that Pelaez-Chavez had dropped the rock and was now picking it back up.

6    Dietrick Dep. 203-205. Viewing the evidence in the light most favorable to Plaintiffs, the record

7    supports a finding that Pelaez-Chavez was picking up a rock in a non-aggressive manner without

8    having made any prior threats to harm anyone. A juror may find that a reasonable officer would

9    not believe Pelaez-Chavez was going to use the rock as a weapon against Dietrick.

10          There are also disputed facts as to whether a reasonable officer would have perceived the

11   rock as a weapon that could cause serious injury or death. The implement was a rock, not a

12   firearm or bladed weapon. Under the circumstances, a rock slightly larger than a softball would

13   require considerable force and precision to cause serious harm. At the time Dietrick shot Pelaez-

14   Chavez, the deputies had been chasing him through rough terrain for over 30 minutes, and Pelaez-

15   Chavez was visibly exhausted. Powers BWC 0:42:30. Powers had reported to Dietrick that

16   Pelaez-Chavez looked "super tired." Pelaez-Chavez was not moving quickly when he walked up

17   the hill to where he faced Dietrick. Dietrick BWC 1:22:32-43. Right before the shooting, Pelaez-

18   Chavez bent over to rest his hands on his knees, and dropped the rock, seemingly by accident. *Id.*

19   at 1:22:50-52. He did not react or attempt to pick up the rock until several seconds later, and a

20   juror could determine that he needed to catch his breath before making the effort of bending down.

21   *Id.* at 1:22:52-58. Meanwhile, Dietrick was on high ground compared to Pelaez-Chavez. Powers

22   BWC 1:03:51. He had a clear visual of Pelaez-Chavez, and did not appear to have any

23   obstructions around his footing that would have made it difficult to retreat or dangerous to fall.

24   *Id.*; Dietrick BWC 1:22:49. Plaintiffs' expert describes the distance between Dietrick and Pelaez-

25   Chavez as about twenty feet at the time of the shooting. DeFoe Report 6. Viewing the evidence

26   in the light most favorable to Plaintiffs, a reasonable juror could determine that Pelaez-Chavez

27   was so exhausted he could barely keep a grip on the rock, let alone suddenly throw it uphill twenty

28   feet with enough force and accuracy to cause serious injury or death. A juror could find that a

1    reasonable officer would not perceive the rock as posing an imminent threat of serious harm.

2          Defendants argue that the "most closely analogous case" is *Lal v. California*, 746 F.3d

3    1112 (9th Cir. 2014), in which the court found it was objectively reasonable for the officers to

4    perceive an immediate threat.  Mot. 13.  The police had received a call about a domestic

5    disturbance where the suspect had hit his wife, and finally cornered the suspect after an extended

6    vehicle chase.  *Lal*, 746 F.3d at 1114.  The suspect told the officers to shoot him, and then he

7    picked up a rock and smashed it against his own forehead.  *Id.*  The suspect then threw several

8    softball-sized rocks at the officers, one of which struck the patrol car, and began walking toward

9    the officers holding a football-sized rock over his head.  *Id.* at 1114-15.  After a warning that the

10   officers would shoot, the officers simultaneously fired at him, killing the suspect.  *Id.* at 1115.  *Lal*

11   is obviously distinguishable from this case.  Dietrick had never seen or heard reports of Pelaez-

12   Chavez hurting or threatening to hurt other people or himself with a rock.  Pelaez-Chavez was not

13   advancing toward Dietrick holding a rock over his head.  In fact, from the time that Pelaez-Chavez

14   stopped in front of Dietrick to the time he was shot, his feet did not move except for a slight

15   adjustment to widen his stance as he was reaching down for the rock.  Powers BWC 1:03:51-54*;*

16   Dietrick BWC 1:22:44-59.  He bent over with his arm straight toward the ground, his head and

17   torso both facing to Dietrick's left.  Pelaez-Chavez was shot before he could lift the rock more

18   than a foot off the ground.  In such circumstances, a reasonable juror could conclude that it was

19   not objectively reasonable to perceive an immediate threat.  In sum, there are material disputes of

20   fact as to whether Dietrick reasonably perceived an imminent threat of serious harm when Pelaez-

21   Chavez bent down to pick up the rock.

### iii.  Active Resistance

23          The Ninth Circuit has explained that "[r]esistance . . . should not be understood as a binary

24   state, with resistance being either completely passive or active.  Rather, it runs the gamut from the

25   purely passive protestor who simply refuses to stand, to the individual who is physically assaulting

26   the officer."  *Bryan*, 630 F.3d at 830.  The parties do not dispute that Pelaez-Chavez was evading

27   arrest by flight and was not complying with the deputies' orders.

### iv.  Other Considerations

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In assessing the government's interest in the use of force, "[o]ther relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cnty*., 673 F.3d 864, 872 (9th Cir. 2011).

Plaintiffs raise facts which indicate that less intrusive alternatives to deadly force were available. At the time of the shooting, Powers was in range with his Taser, and he fired and struck Pelaez-Chavez almost simultaneously with Dietrick. DeFoe Report 21. In other words, viewed in Plaintiffs' favor, the facts support that Powers could have successfully neutralized the threat in a non-lethal manner before Pelaez-Chavez lifted the rock more than a foot or two from the ground. *See id.* at 19. There is evidence that Dietrick was aware of Powers's position at the time of the shooting. Dietrick stated that he knew Powers was to his left, and Powers's BWC footage indicates that he had called out to Dietrick a second before the shooting. SRPD Interview 605-606; Powers BWC 1:03:51. "[A]lthough officers are not required to use the least intrusive degree of force possible, the availability of alternative methods is a relevant factor in determining whether the amount of force used in a particular instance was, in fact, reasonable." *Nelson*, 685 F.3d at 882 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994); *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005), *disapproved on other grounds by Lemos v. Cnty. of Sonoma*, 40 F.4th 1002 (9th Cir. 2022)). A reasonable juror may find that Dietrick should have known Powers was in position and ready to deploy the Taser, potentially stopping Pelaez-Chavez before he could cause any harm with the rock. The availability of the Taser as an alternative to Dietrick's lethal weapon weighs against a finding of reasonableness.

In addition, throughout the 30-minute pursuit through the hills, neither Powers nor Dietrick ever warned Pelaez-Chavez that they would shoot. Although Dietrick repeatedly shouted at Pelaez-Chavez to "drop it" or "put it down" before shooting, he did not attempt to use a Spanish command despite having used them previously—including "manos arriba" (hands up)—while knowing that Pelaez-Chavez appeared to only understand Spanish. Dietrick BWC 1:06:38; 1:11:14; Dietrick Dep. 115, 144. Dietrick's failure to give any kind of warning, as well as his failure to use comprehensible commands, makes the use of force less reasonable under the

circumstances.  *See Nelson v. City of Davis*, 685 F.3d 867, 882-83 (9th Cir. 2012) (finding that failure to give sufficient warnings weighed against the government's decision to use force).

Based on Pelaez-Chavez's behavior, Plaintiffs' expert opined that a reasonable officer would have determined Pelaez-Chavez was mentally ill, experiencing a mental crisis, and/or was under the influence of a controlled substance.  DeFoe Report 7, 15.  Dietrick admitted he suspected Pelaez-Chavez was under the influence of methamphetamine.  Dietrick Dep. 129.  "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."  *Glenn*, 673 F.3d at 876 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)).  This factor weighs against a finding of reasonableness.

### c.    Weighing the Intrusion on Pelaez-Chavez's Fourth Amendment Interests Against the *Graham* Factors

To assess the objective reasonableness of Dietrick's use of deadly force, the court must balance "the nature and quality of the intrusion on [Pelaez-Chavez's] Fourth Amendment interests against the countervailing governmental interests at stake."  *See Graham*, 490 U.S. at 396 (citation and quotation omitted).  Drawing all reasonable inferences in Plaintiffs' favor, a jury could conclude that, although Pelaez-Chavez was resisting arrest by flight and refusing to comply with the deputies' orders, he was suspected only of committing nonviolent property crimes.  A jury could find that he did not pose an immediate threat to the deputies' safety when he was picking up the rock.  And a jury could find that less intrusive alternatives to deadly force were available, the deputies failed to give proper warnings, and Pelaez-Chavez was clearly emotionally disturbed.  Weighing Pelaez-Chavez's Fourth Amendment interests against the governmental interests at stake, a jury could ultimately conclude that Dietrick's use of deadly force was not reasonable under the circumstances.

### 3.    Qualified Immunity

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'"  *Moss v. U.S. Secret Serv.*, 675 F.3d 1213, 1222
(9th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The qualified immunity
analysis considers whether (1) the officer's conduct violated a constitutional right, and (2) that
right was clearly established at the time of the incident.  *Pearson*, 555 U.S. at 232.  The court may
exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis
should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.

Having found a genuine dispute of material fact as to the first question in the qualified
immunity analysis, the court turns to the second question.

"A clearly established right is one that is 'sufficiently clear that every reasonable official
would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7,
11-12 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  The Supreme
Court has cautioned that specificity in determining whether "the violative nature of *particular*
conduct is clearly established . . . is especially important in the Fourth Amendment context, where
the Court has recognized that it is sometimes difficult for an officer to determine how the relevant
legal doctrine, here excessive force, will apply to the factual situation the officer confronts."
*Mullenix*, 577 U.S. at 12 (quotation omitted).  "Use of excessive force is an area of the law 'in
which the result depends very much on the facts of each case,' and thus police officers are entitled
to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."
*Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 13).  While
qualified immunity "does not require a case directly on point for a right to be clearly established,
existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* at
1152 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  Finally, "[i]t is the plaintiff who bears the
burden of showing that the rights allegedly violated were clearly established."  *Shafer v. Cty. of
Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation
omitted).

Plaintiffs argue this is an "obvious" case where the general standards set forth in *Graham*
and *Garner* can clearly establish that a constitutional violation occurred, even without a body of
relevant case law, citing *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624 (9th Cir.), *cert. denied*

United States District Court
Northern District of California

1   *sub nom. Cnty. of Riverside, California v. Est. of Clemente Najera-Aguirre*, 143 S. Ct. 426 (2022).

2   In *Aguirre*, there was a factual dispute about the threat posed by the suspect immediately before

3   his death.  By some accounts, at the time the officer shot the suspect, the suspect was standing

4   with his back to the police officer no more than fifteen feet away and was holding a stick with the

5   tip pointed down.  *Id.* at 626-27.  Viewing the evidence in the light most favorable to the non-

6   moving party, the Ninth Circuit held that the suspect posed no immediate threat to the officer or

7   others at the time he was shot.  *Id.* at 628.  Therefore, the "general constitutional rule" that deadly

8   force was not justified where the suspect posed no immediate threat to the officer or others applied

9   "with obvious clarity," and rendered the officer's decision to shoot the suspect "objectively

10  unreasonable."  *Id.* at 629 (citing *Garner*, 471 U.S. at 11; *Hope v. Pelzer*, 536 U.S. 730, 741

11  (2002)).  The Ninth Circuit also held that, at the time of the incident in 2016, there was a body of

12  relevant case law which "made 'clear to a reasonable officer' that a police officer may not use

13  deadly force against a non-threatening individual, even if the individual is armed, and even if the

14  situation is volatile."  *Id.* (citing *Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013);

15  *George v. Morris*, 736 F.3d 829 (9th Cir. 2013)).

16       Defendants argue that *Aguirre* is distinguishable because Pelaez-Chavez was not standing

17  with his back turned to Dietrick and instead was facing Dietrick and reaching for a weapon.  Reply

18  9.  For starters, as discussed above, these particular facts are disputed.  A reasonable juror could

19  determine that Pelaez-Chavez was facing to the side when Dietrick shot him, Autopsy Report

20  SRPD-00360, and that the rock could not reasonably be perceived as a weapon that could cause

21  serious harm under the circumstances.  Defendants also cite *Waid v. Cnty. of Lyon*, 87 F.4th 383,

22  389 (9th Cir. 2023), which cautioned that the Ninth Circuit has "only found obvious violations in

23  exceedingly rare circumstances with extreme facts."  In *Waid*, the Ninth Circuit granted qualified

24  immunity where the officers were responding to an active domestic violence situation in the

25  suspect's home.  *Id.*  The suspect used aggressive language with the officers, ignored an order

26  from the officers, and rushed towards them in a small and confined space, at which point the

27  officers shot and killed him.  *Id.*  The circumstances in this case are more similar to *Aguirre* than

28  to *Waid*.  In *Waid*, it was objectively reasonable for the officers to perceive an immediate threat

based on the undisputed facts.  *Id.*  Here, as in *Aguirre*, disputes of fact remain regarding the threat posed by Pelaez-Chavez immediately before he was shot.  *See Aguirre*, 29 F.4th at 626-27. Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that no reasonable officer would have perceived Pelaez-Chavez picking up a rock to be an immediate threat.  Unlike in *Waid,* Dietrick was not in a small or confined space; there was not an active violent crime in progress; and Pelaez-Chavez never rushed or raised a weapon or threw a rock at anyone to Dietrick's knowledge.  Moreover, Pelaez-Chavez was approximately 20 feet away and downhill from Dietrick and was visibly winded.  A reasonable juror could determine it was highly doubtful Pelaez-Chavez could throw the rock in a manner that could cause serious harm to Dietrick.  Considering these facts in Plaintiffs' favor, the "general constitutional rule" that deadly force is not justified where the suspect posed no immediate threat applies "with obvious clarity." *See Aguirre,* 29 F.4th at 629.

Additionally, Plaintiffs cite *Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013), which clearly established that deadly force is not reasonable against a non-threatening individual, "even if the individual is armed, and even if the situation is volatile."  *See Aguirre,* 29 F.4th at 629.  In *Hayes*, the Ninth Circuit found that, although the decedent was moving towards the deputies with a knife raised, a reasonable jury may find that it was not objectively reasonable for the deputies to perceive an immediate threat.  *Hayes,* 736 F.3d at 1234-35.  The deputies had entered the decedent's house as a welfare check because of a report that the decedent was potentially suicidal, not because of a crime.  *Id.* at 1227.  The deputies found the decedent in his kitchen approximately eight feet away from them.  *Id.*  They ordered the decedent to "show [] his hands," and the decedent turned, took one or two steps toward them, and raised his hands, revealing a large knife in his right hand.  *Id.* at 1228.  Without further orders or warnings, the deputies shot and killed him.  *Id.*  The Ninth Circuit found that there was no clear evidence the decedent had threatened the deputies with the knife, as opposed to simply complying with their orders.  *Id.* at 1234.  The Ninth Circuit emphasized that the decedent was still at least six feet away, that he was not charging them, and that the deputies could have easily ordered the decedent to stop or drop the knife but failed to do so.  *Id.* at 1233-35.  In such circumstances, the Ninth

Circuit found that reasonable jurors could conclude that the deputies' use of deadly force was not objectively reasonable.  Likewise, there is no clear evidence that Pelaez-Chavez threatened Dietrick with the rock.  There is a factual dispute whether he made a gesture as if to throw the rock, and whether the rock could reasonably be perceived as a deadly weapon.  Dietrick failed to warn that he would shoot, failed to use a Spanish command, and a juror could find that Dietrick easily could have waited one second for Powers to deploy the Taser but failed to do so.  Even though Pelaez-Chavez was armed and acting erratically, drawing all reasonable inferences in Plaintiffs' favor, a reasonable officer should know from clearly established precedent that the circumstances were insufficient to justify the use of deadly force.

"The doctrine of qualified immunity . . . 'acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.'"  *Aguirre*, 29 F.4th at 627 (quoting *Wyatt v. Cole*, 504 U.S. 158, 168 (1992)).  "As the architects of qualified immunity, courts must ensure that the doctrine remains tethered to this principle."  *Id.*  Qualified immunity is not appropriate if "any reasonable official in the defendant's shoes would have understood that he was violating" a constitutional right.  *Plumhoff v. Rickard*, 572 U.S. 765, 778–779 (2014).  Viewing the evidence in the light most favorable to Plaintiffs, as the court must on summary judgment, any reasonable official in Dietrick's shoes would have understood that Pelaez-Chavez posed no immediate threat and that the use of deadly force was not justified.

The court denies summary judgment on Plaintiffs' Fourth Amendment excessive force claim.

### D.    Loss of Familial Association

Defendants argue they are entitled to summary judgment on Plaintiffs' Fourteenth Amendment familial association claim because there is no evidence that any officer's conduct shocks the conscience.  Mot. 14-15.  They do not make a qualified immunity argument on this claim.

#### 1.    Legal Standard

The Fourteenth Amendment states in relevant part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

1  "[A] parent has a constitutionally protected liberty interest under the Fourteenth Amendment in

2  the companionship and society of his or her child and . . . a child's interest in her relationship with

3  a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." *Ochoa v. City

4  of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (cleaned up).  In order to show a violation of the

5  right to familial association under the Fourteenth Amendment's due process clause, a plaintiff

6  must establish that the officers' conduct "shocks the conscience." *Cnty. of Sacramento v. Lewis*,

7  523 U.S. 833, 846 (1998); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

8       "There are two tests used to decide whether officers' conduct 'shocks the conscience.'"

9  *Ochoa*, 26 F.4th at 1056.  "Which test applies turns on whether the officers had time to deliberate

10  their conduct." *Id.*  The "deliberate indifference" standard applies "if the situation at issue

11  'evolve[d] in a time frame that permits the officer to deliberate before acting.'" *Id.* (quoting

12  *Porter*, 546 F.3d at 1137).  "As the very term 'deliberate indifference' implies, the standard is

13  sensibly employed only when actual deliberation is practical[.]" *Lewis*, 523 U.S. at 851-53.

14  "Deliberation in this context 'should not be interpreted in the narrow, technical sense.'" *Ochoa*,

15  26 F.4th at 1056 (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (explaining that

16  "the Supreme Court had rejected the deliberate indifference standard even in cases where an

17  officer giving chase could have deliberated while pursuing the suspect." (citing *Porter*, 546 F.3d at

18  1139-40))).

19       A different test applies to situations "that escalate so quickly that the officer must make a

20  snap judgment." *Porter*, 546 F.3d at 1137.  In those cases, the "purpose to harm" standard applies.

21  This standard requires a plaintiff to make "a more demanding showing that [an officer] acted with

22  a *purpose to harm* [the decedent] for reasons unrelated to legitimate law enforcement objectives."

23  *Id.* (emphasis in original) (citing *Lewis*, 523 U.S. at 836).  "For example, a purpose to harm might

24  be found where an officer uses force to bully a suspect or 'get even,'" *Wilkinson*, 610 F.3d at 554

25  (citation omitted), "or when an officer uses force against a clearly harmless or subdued suspect."

26  *Ochoa*, 26 F.4th at 1056 (quotation marks and citations omitted).  The Ninth Circuit has explained

27  that "when an officer encounters fast paced circumstances presenting competing public safety

28  obligations, the purpose to harm standard must apply." *Id.* at 1139.

United States District Court
Northern District of California

"A court may determine at summary judgment whether the officer had time to deliberate (such that the deliberate indifference standard applies) or instead had to make a snap judgment because he found himself in a quickly escalating situation (such that the purpose to harm standard applies), so long as the undisputed facts point to one standard or the other." *C.E.W. v. City of Hayward*, No. 13-CV-04516-LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015) (quotation marks and citation omitted). "By its nature, though, the determination of which situation [the officer] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards." *Id.* (alteration in original; quotation marks and citation omitted).

### 2. Analysis

Plaintiffs concede that the "purpose to harm" standard applies and argue they have met that standard. Opp'n 22. They contend that Dietrick shot Pelaez-Chavez not out of a legitimate concern for his safety, but because he was exhausted and wanted to quickly end the pursuit. *Id.* They also argue that Dietrick used deadly force because he was "obese" and afraid that he could not keep up with Pelaez-Chavez and Powers. *Id.*

To prevail, Plaintiffs must prove that Dietrick's purpose "was 'to cause harm [to Pelaez-Chavez] unrelated to the legitimate object of arrest.'" *Porter*, 546 F.3d at 1140 (quoting *Lewis*, 523 U.S. at 836); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 797-98 (9th Cir. 2014) ("a use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objectives."). "The purpose to harm standard is a subjective standard of culpability." *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). "[A]lthough most meritorious purpose to harm claims will involve evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use of force," the Ninth Circuit has "decline[d] to hold that such evidence is required as a matter of law." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019). "In some cases, a use of force might be so grossly and unreasonably excessive that it alone could evidence a subjective purpose to harm." *Id.*

As stated above, the court cannot take judicial notice that Dietrick was "clinically obese." However, the record indisputably shows that Dietrick fell behind Pelaez-Chavez and Powers at

1    some point and lost his footing at least once.  Dietrick Dep. 137; Dietrick BWC 1:22:16.  He had

2    also cursed to himself when he paused to catch his breath on his way up a hill.  Dietrick BWC

3    1:00:30.  It is undisputed that the deputies chased Pelaez-Chavez on foot through difficult and

4    exhausting terrain for 30 minutes, and that Pelaez-Chavez did not comply with any of the

5    deputies' orders or respond to their attempts to build rapport.  Although Dietrick testified that he

6    was not frustrated by the chase, Dietrick Dep. 139, a reasonable juror could doubt his credibility

7    on this point, considering Dietrick's actions as captured on the BWC and the fact that the pursuit

8    was lengthy and physically taxing.

9         In addition, viewing the facts in favor of Plaintiffs, a reasonable juror could infer that

10   Dietrick's conduct immediately before the shooting indicated he was trying to escalate the

11   situation to quickly end the pursuit.  Pelaez-Chavez was in a remote, uninhabited area and a

12   helicopter was tracking him, so there was no immediate danger he would harm someone or escape.

13   Dietrick and Powers had already agreed that Powers would attempt to use a Taser to stop Pelaez-

14   Chavez, and Dietrick would provide "lethal cover."  Powers BWC 0:52:40; Dietrick Dep. 142.

15   Instead of providing cover for Powers, Dietrick independently intercepted Pelaez-Chavez as he

16   walked out of the shrubbery, raised his gun, and aggressively yelled at him to "drop it" or "put it

17   down."  Dietrick BWC 1:22:32.  Dietrick used only English commands at this critical juncture

18   even though he knew Pelaez-Chavez had been speaking exclusively in Spanish and did not appear

19   to understand English, and Dietrick had previously used Spanish commands such as "manos

20   arriba" (hands up).  *Id.* at 1:11:14.  Dietrick did not warn Pelaez-Chavez that he would shoot.

21   After Dietrick intercepted him, Pelaez-Chavez stopped and did not move his feet, and Powers was

22   able to get in range with the Taser.  Dietrick knew Powers was getting into position.  SRPD

23   Interview 605-606.  Dietrick did not simply hold Pelaez-Chavez at lethal cover and wait for

24   Powers to deploy the Taser.  Instead, Dietrick took two steps toward Pelaez-Chavez.  Powers

25   BWC 1:03:51-53.  Only after Dietrick began to approach did Pelaez-Chavez reach for the rock.

26   *Id.* at 1:03:53.  Rather than stepping back or waiting for Powers, Dietrick immediately responded

27   with deadly force.  *Id.*  Drawing all inferences in favor of Plaintiffs, a reasonable juror could find

28   that Dietrick used excessive force out of frustration with Pelaez-Chavez and a desire to end the

1    lengthy foot chase.

2           Defendant did not advance a qualified immunity argument on the Fourteenth Amendment

3    claim.  "[A] Fourteenth Amendment claim of excessive force 'must be governed by a different

4    standard than' a Fourth Amendment claim of excessive force. . . . Thus, our Fourth Amendment

5    cases cannot clearly establish the contours of the Fourteenth Amendment right, despite similarities

6    between the standards."  *Nicholson v. City of Los Angeles*, 935 F.3d 685, 696 n.5 (9th Cir. 2019)

7    (quoting *Byrd v. Guess*, 137 F.3d 1126, 1133–34 (9th Cir. 1998)).  As Defendants fail to raise the

8    issue in their motion for summary judgment, the court will not consider qualified immunity with

9    respect to the Fourteenth Amendment claim.

10          The court denies summary judgment on Plaintiffs' Fourteenth Amendment claim.

11   **E.      Negligence**

12          Plaintiffs' final claim is for negligence resulting in Pelaez-Chavez's wrongful death.  To

13   prevail on a negligence claim, Plaintiffs must establish "(1) a legal duty to use due care; (2) a

14   breach of that duty; and (3) injury that was proximately caused by the breach."  *Knapps v. City of*

15   *Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cty. of San Mateo*, 12

16   Cal.4th 913, 917 (1996)).  In *Hayes v. County of San Diego*, 57 Cal. 4th 622, 639 (2013), the

17   California Supreme Court held that an officer's "tactical conduct and decisions preceding the use

18   of deadly force are relevant considerations under California law in determining whether the use of

19   deadly force gives rise to negligence liability."  Under California law, "peace officers have a duty

20   to act reasonably when using deadly force, a duty that extends to the totality of the circumstances

21   surrounding the shooting, including the officers' preshooting conduct."  *Id.* at 638.

22          "Thus, negligence claims under California law encompass a broader spectrum of conduct

23   than excessive force claims under the Fourth Amendment."  *Mulligan v. Nichols*, 835 F.3d 983,

24   991 (9th Cir. 2016).  Judge Friedland recently explained the distinction between federal and state

25   law in her concurring opinion in *J.A.L. v. Santos*, 724 Fed. Appx. 531 (9th Cir. 2018), and

26   concluded that the distinction should have driven a different result in light of the particular facts of

27   that case:

28                 Under federal law, 'even if an officer negligently provokes a violent

United States District Court
Northern District of California

response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.' *Billington*, 292 F.3d at 1190 (emphasis omitted). I agree that [it is beyond dispute that at the moment of the shooting, the officer] had probable cause to believe Lopez posed 'a significant threat of death or serious physical injury to' Officer Van der Hoek, *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). I therefore agree that the district court properly granted summary judgment in favor of the officers on J.L.'s Fourth Amendment claim.

But California law is different, and in my view that difference should have precluded summary judgment on J.L.'s negligence claim. Under California law, unlike under federal law, what officers do before shooting can 'show that an otherwise reasonable use of deadly force was in fact unreasonable.' *Hayes*, 57 Cal. 4th at 630. This means that 'tactical conduct and decisions preceding the use of deadly force' may 'give[ ] rise to negligence liability' if they 'show, as part of the totality of circumstances, that the use of deadly force was unreasonable.' *Id.* at 626. Construing the record in the light most favorable to J.L., a reasonable jury could find that the officers precipitated the need for deadly force, and that the officers' use of deadly force was unreasonable under California law as a result. J.L.'s negligence claim should therefore have made it to trial.

724 Fed. Appx. at 534-35 (Friedland, J., concurring).

As with excessive force claims brought under the Fourth Amendment, California law evaluates the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hayes*, 57 Cal. 4th at 632 (quoting *Graham*, 490 U.S. at 396). *Hayes* cautions that in cases "where the preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the reasonableness of the officers' preshooting conduct should not be considered in isolation. Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable." *Id.*

Defendants assert without elaboration that Dietrick's conduct was reasonable, and that he did not violate any "mandatory duty or established standard." Reply 11. As previously discussed, a jury may conclude it was unreasonable for Dietrick to use deadly force in response to Pelaez-Chavez reaching for a rock. Plaintiffs also offer DeFoe's expert opinion finding that Dietrick's pre-shooting conduct and use of deadly force fell below established police standards of practice. DeFoe Report 7-27.

The court denies summary judgment on the negligence claim.

27

## V.    MOTION TO SEAL

Pursuant to Civil Local Rules 7-11 and 79-5(f), Plaintiffs filed an administrative motion to consider whether another party's material should be sealed, seeking to seal the transcript of Dietrick's SRPD interview and to redact the portions of Plaintiffs' opposition quoting the interview.  [Docket No. 70.]  "[A] court may seal records only when it finds 'a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture.'"  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016).  At oral argument, the parties agreed that there was no compelling need to file the material under seal.  The court denies the motion to seal.

## VI.    CONCLUSION

Plaintiffs have dismissed their *Monell* claim.  The court denies summary judgment on all other claims.

**IT IS SO ORDERED.**

Dated: November 15, 2024

_____
Donna M. Ryu
Chief Magistrate Judge